#24132-aff in pt, rev in pt & rem-JKK

**2007 SD 82**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

KYLIE BURLEY,                                   Plaintiff and Appellant,

  v.

KYTEC INNOVATIVE SPORTS
EQUIPMENT, INC.,                              Defendant and Appellee.

    and

WEST CENTRAL SCHOOL DISTRICT,        Third Party Defendant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

\* \* \* \*

HONORABLE STUART L. TIEDE
Judge

\* \* \* \*

GARY J. PASHBY
MICHAEL F. TOBIN of
Boyce, Greenfield, Pashby,
 & Welk, LLP                                   Attorneys for plaintiff
Sioux Falls, South Dakota                  and appellant.

MARK J. ARNDT
SCOTT R. SWIER of
May & Johnson, PC                             Attorneys for defendant
Sioux Falls, South Dakota                  and appellee.

\* \* \* \*

ARGUED ON NOVEMBER 29, 2006

OPINION FILED **08/01/07**

#24132

KONENKAMP, Justice

[¶1.]    Plaintiff was injured when a sports product manufactured by defendant malfunctioned and struck her arm.  She brought suit against defendant alleging negligence, strict liability (defective design), and strict liability (failure to warn).  Defendant moved for summary judgment on all claims and also sought to prohibit the testimony of her proposed expert witness.  On finding that plaintiff's expert was not qualified to testify that the instructions provided with defendant's product were inadequate, the circuit court excluded the testimony.  The court then granted defendant's motion for summary judgment, ruling that, without expert testimony, plaintiff had insufficient evidence to meet her burden of proof on all her claims.  On appeal, we conclude that because the circuit court set the bar too high in determining the admissibility of the expert's opinion, it should not have been excluded, and thus plaintiff's failure to warn claims may be able to proceed.  We affirm in part, reverse in part, and remand.

**I.**

[¶2.]    On April 12, 2001, Kylie Burley, a high school athlete, was injured in her school hallway while using a training device her coaches provided.  It is called the Overspeed Trainer, manufactured and sold by Kytec Innovative Sports Equipment, Inc.  The purpose of the Overspeed Trainer is to help improve a runner's speed. The device can be used for either resistance or speed training.  It requires two athletes to use, one, called the pacer, and the other, the sprinter.  The sprinter wears a belt with a single release hook, and the pacer wears a belt equipped with a single swivel hook.  A cord connects the two runners.  The cord is

-1-

tied to a post or other anchor. It is then extended through a pulley on the back of the belt worn by the pacer through to the rope end ring, which is attached to a release hook on the belt worn by the sprinter. The cord has a Velcro connection, termed a "ripcord," which, according to the provided instructions, "will break loose and release the [s]printer if the pull becomes too great[.]"

[¶3.] After the cord and belts are in place, the pacer and the sprinter begin to run in the same direction, in either the same lane or two separate lanes, but the pacer is ahead of the sprinter. The pacer is to run faster than the sprinter, in effect pulling the sprinter to keep up and thereby increasing the sprinter's speed. According to the instructions, "[t]he rope will automatically release from the Sprinter when the Pacer slows down or reaches the stopper ring (located 5 meters from the end ring; You'll see how it works when you walk through it the first time.)." Also, the instructions indicate that the sprinter can release herself "with a quick chop downward to the tow line."

[¶4.] Burley was using the Overspeed Trainer under the direction of her West Central High School track coach, Darrell Horacek. Horacek and assistant track coach, Denise Kennedy, introduced the brand new Overspeed Trainer for the first time the day Burley was injured. Before letting the students use the device, Horacek and Kennedy read the product's instructions and attempted to assemble it. Horacek found that the instructions were of no help. However, because Kennedy had experience using a similar device while on the University of South Dakota's track team, and Horacek had used one during a training weekend at the University, the two attempted to prepare the Overspeed Trainer for the students' use. After

Horacek assembled it, he attempted to use it to see if it would release as the instructions indicated. He noticed that the hook on the sprinter's belt would rotate downward, thereby "making it virtually impossible for a 'downward chop' to release the hook and ring." Because the downward chop was a means of releasing the sprinter from the pacer's pull, Horacek decided to bend the hook just enough to make it easier for the ring to release. He bent the hook by using pliers and then tried using the device again. This time he believed that the hook and ring released appropriately after he applied the downward chop. He offered the Overspeed Trainer for use to both the girls' and boys' track teams.

[¶5.]     After the boys used it, Burley was one of the first girls to try the device. Details of the accident are not entirely clear from the record. Burley recalled that she was injured when her arm was struck from behind by the ring that was supposed to be attached to the sprinter's belt. Horacek believed that the ring broke free, recoiled, and then hit Burley. The impact of the ring fractured the ulna bone in her left arm, requiring surgery and the implantation of a metal plate with screws.

[¶6.]     Burley brought suit against Kytec, alleging that the company was negligent in its warnings, design, and construction of the Overspeed Trainer. She also alleged that because of the defective design and failure to warn, Kytec was strictly liable for her injuries. Kytec brought a third-party complaint against West Central School District for indemnity and contribution.[1] Dr. Jan Berkhout of the

---

1.     Burley settled her claim against West Central School District.

University of South Dakota was retained as an expert solely for Burley's failure to warn claims. Burley sought to offer an opinion from Dr. Berkhout that the instructions included with the Overspeed Trainer were "seriously deficient." Kytec moved to exclude this expert testimony and also sought summary judgment on all claims.

[¶7.] According to Kytec, Dr. Berkhout lacked the knowledge, skill, experience, training, or education necessary to render an expert opinion in this case. *See* SDCL 19-15-2 (Rule 702). In its memorandum decision, the circuit court concluded that Dr. Berkhout's proposed testimony would provide "the trier of fact with relevant evidence that would assist them in determining whether the instructions [were] deficient."[2] However, the court found that Dr. Berkhout was not qualified to offer an expert opinion about whether the instructions accompanying the Overspeed Trainer were inadequate or improper.

[¶8.] Dr. Berkhout is a professor of Psychology and the Director of the Heimstra Human Factors Laboratory at the University of South Dakota. He has a degree in physiology and biopsychology from the University of Chicago, obtained in 1962, and since 1993 is certified as a professional ergonomist by the Board of Certification of Professional Ergonomists. Nonetheless, the circuit court concluded

---

2. We agree with the circuit court that Dr. Berkhout's opinions would be relevant. Kytec argues that Dr. Berkhout's opinions about failure to warn are irrelevant primarily because Burley never read the instructions on using the Overspeed Trainer, so she could not have been confused or misled by them. However, Kytec knew that this product was sold to schools where the users would be minor student athletes. It knew that coaches or school personnel would be the ones who actually read the instructions before the students used the product.

that "Dr. Berkhout has not received any specified training or education related to product instruction," does not have "expertise on questions of display, syntax and emphasis[,]" and has no "personal experience writing or evaluating warning labels for athletic equipment." Accordingly, the court granted Kytec's motion to exclude Dr. Berkhout's testimony.

[¶9.]     The court then addressed Kytec's motion for summary judgment. In her complaint, Burley alleged that Kytec "negligently designed and manufactured the Overspeed Trainer." But she offered no expert testimony to assist the trier of fact in determining whether the product was defectively manufactured or designed or whether the actions of Kytec in designing and manufacturing the product were reasonable under the circumstances. The court held that for this claim expert testimony was necessary.

[¶10.]     As to Burley's claim alleging that Kytec was strictly liable for her injuries because the device "was in a defective condition and was unreasonably dangerous," the court similarly concluded that expert testimony was necessary. In the court's words, "it cannot be said that common experience tells us that Burley's injuries could not have occurred absent a defect in the Overspeed Trainer, and Burley has failed to negate other causes of her injuries, namely user error or product modification."

[¶11.]     Finally, the court examined Burley's last claim that Kytec was liable for its failure to provide adequate warnings of the dangers of the Overspeed Trainer. Because the court had excluded Dr. Berkhout's testimony, the question became whether she could proceed without expert opinion. After identifying the

elements necessary for her to prevail on the claims for inadequate warnings, the court held that "Burley has not presented this court with any evidence indicating that it would be able to meet its burden with respect to all those elements." Thus, all her negligence and strict liability claims were dismissed. Burley appeals.

## II.

[¶12.] We review a circuit court's decision to admit or deny an expert's testimony under the abuse of discretion standard. State v. Guthrie, 2001 SD 61, ¶30, 627 NW2d 401, 414-15 (internal citations omitted); *see also* State v. Edelman, 1999 SD 52, ¶4, 593 NW2d 419, 421 (citing State v. Bachman, 446 NW2d 271, 275 (SD 1989)); Zens v. Harrison, 538 NW2d 794, 795 (SD 1995) (citations omitted); State v. Logue, 372 NW2d 151, 156 (SD 1985) (citations omitted). "Although we have repeatedly invoked stock definitions, the term 'abuse of discretion' defies an easy description. It is a fundamental error of judgment, a choice outside the range of permissible choices, a decision, which, on full consideration, is arbitrary or unreasonable." Arneson v. Arneson, 2003 SD 125, ¶14, 670 NW2d 904, 910 (citation omitted.).

[¶13.] Admissibility of expert testimony is governed by SDCL 19-15-2 (Rule 702). Under this rule, before a witness can testify as an expert, that witness must be "qualified." *Id.* Furthermore, "[u]nder *Daubert*, the proponent offering expert testimony must show that the expert's theory or method qualifies as scientific, technical, or specialized knowledge" as required under Rule 702. *Guthrie*, 2001 SD 61, ¶34, 627 NW2d at 415-16; Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 US 579, 597, 113 SCt 2786, 2799, 125 LEd2d 469 (1993). Before admitting expert

testimony, a court must first determine that such qualified testimony is relevant and based on a reliable foundation. *Guthrie*, 2001 SD 61, ¶32, 627 NW2d at 415. The burden of demonstrating that the testimony is competent, relevant, and reliable rests with the proponent of the testimony. SDCL 19-9-7 (Rule 104(a)). The proponent of the expert testimony must prove its admissibility by a preponderance of the evidence. *Daubert*, 509 US at 592 n10, 113 SCt at 2796 n10, 125 LEd2d 469 n10. "Relevance embraces 'evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *Guthrie*, 2001 SD 61, ¶32, 627 NW2d at 415 (quoting SDCL 19-12-1).

[¶14.] In this case, Burley offered Dr. Berkhout as an expert only on her claims pertaining to warnings and instructions. The circuit court found that Dr. Berkhout's proposed testimony was relevant under *Daubert*, as it "would assist [the trier of fact] in determining whether the instructions are deficient." However, it determined under Rule 702 that he was "not qualified to offer expert testimony in this case" even though he has "impressive credentials and expertise in a variety of areas[.]" Specifically, the court reasoned:

> Dr. Berkhout testified that he has never been previously retained as an expert witness for inadequate warnings or improper instructions. . . . Dr. Berkhout was unfamiliar with the American National Standards Institute (ANSI), and therefore unfamiliar with the ANSI guidelines for warnings. . . . Dr. Berkhout has not received any specified training or education related to product instructions, and while formalized training is not a prerequisite for admission under SDCL 19-15-2 [(Rule 702)], Burley has not demonstrated that Dr. Berkhout is qualified experientially. Dr. Berkhout has never personally drafted warnings or instructions for any device[,] much less a device similar to the Overspeed Trainer.

Further, the court stated that "relevant case law emphasizes that a warnings expert should demonstrate expertise in the specific field in question" and "Dr. Berkhout testified that he does not have any particular expertise in athletic training products, in the training of track athletes, or the training of athletes of any kind."

[¶15.] According to Burley, on the other hand, Dr. Berkhout is more than qualified to render an expert opinion that the instructions for the Overspeed Trainer were deficient. In particular, she contends that Dr. Berkhout, as a certified ergonomist, studies "the interface and relationship between products and the users of such products," and "warnings and instructions that accompany such a product are integral to the endeavor."[3] Moreover, she avers that he "teaches graduate and doctoral level classes at the University of South Dakota specifically on instructions and warnings." Burley believes that the circuit court "wrongly focused on the athletic nature and purpose of the equipment, and wrongly required that Dr. Berkhout have some level of expertise in the realm of athletic equipment and with athletics in general." Instead, she contends that Dr. Berkhout's experience with

---

3. A number of federal courts have used the *Daubert* framework in evaluating the admissibility of opinions from professional ergonomists. *See* Magdaleno v. Burlington Northern R.R. Co., 1998 WL 239300 (DColo) (unpublished); Finley v. NCR Corp., 964 FSupp 882, 886 (DNJ 1996); Dennis v. Pertec Computer Corp., 927 FSupp 156, 161 (DNJ 1996), *aff'd*, 135 F3d 764 (3dCir 1997); Bennett v. PRC Public Sector, Inc., 931 FSupp 484, 493-94 (SDTex 1996); Vice v. Northern Telecom, Inc., 1996 WL 200281 (EDLa) (unpublished); Dukes v. Illinois Central R.R. Co., 934 FSupp 939, 947 (NDIll 1996); Zarecki v. Nat'l R.R. Passenger Corp., 914 FSupp 1566, 1572-73 (NDIll 1996); ; Schneck v. Int'l Business Machines Corp., 1996 WL 885789 (DNJ) (unpublished); Bowers v. Northern Telecom, Inc., 905 FSupp 1004, 1009-10 (NDFla.1995); Hopkins v. NCR Corp., 1994 WL 757510 (MDLa) (unpublished), *aff'd*, 53 F3d 1281 (5thCir 1995).

athletics or athletic training should go more to the weight of his opinion, rather than to its admissibility.

[¶16.] A trial court is responsible for deciding whether an expert's knowledge will "assist the trier of fact to understand the evidence or to determine a fact in issue," under Rule 702. SDCL 19-15-2; s*ee also* Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc., 254 F3d 706, 715 (8thCir 2001) (citing Kumho Tire Co., Ltd. v. Carmichael, 526 US 137,156, 119 SCt 1167, 1178, 143 LEd2d 238 (1999)). And that responsibility includes determining "whether a particular expert has sufficient specialized knowledge to assist jurors in deciding the specific issues in the case." *Wheeling Pittsburgh Steel Corp.*, 254 F3d at 715 (citation omitted).

[¶17.] In examining the circuit court's decision on Dr. Berkhout's qualifications, we find several problems in the court's analysis. To conclude, as the court did, that because Dr. Berkhout had "never been previously retained as an expert witness for inadequate warnings or improper instructions," he was therefore not qualified to testify means that no one could qualify as an expert for the first time in our courts without having first qualified somewhere else. Mere experience as a practiced litigation witness is a poor touchstone for measuring genuine expert qualifications. *See* First Western Bank Wall v. Olsen, 2001 SD 16, ¶9, 621 NW2d 611, 615-16 (expert's qualifications should not be examined under a "restricted focus").

[¶18.] A questionable inference can also be seen in the circuit court's statement that "Dr. Berkhout was unfamiliar with the American National Standards Institute (ANSI), and therefore unfamiliar with the ANSI guidelines for

warnings." Although this may perhaps demonstrate limitations in his general knowledge of the field, neither the court nor counsel for Kytec cited a single ANSI standard that might conceivably apply in this case. How can an expert witness be disqualified for being unfamiliar with standards not shown to be relevant?

[¶19.] Another reason cited by the circuit court in finding Dr. Berkhout less than qualified was the fact that he "has not received any specified training or education related to product instructions[.]" However, Dr. Berkhout has himself taught graduate level courses dealing with instructions and warnings. These include a course on the psychology of safety, with planning for warnings and instructions, and a course covering the comprehensibility and readability of instructions, labels, and signs. Reading, study, and practice can be a source of education and knowledge sufficient to qualify a person as an expert. *See* John W. Strong, McCormick on Evidence, § 13, 24 (5thed 1999).

[¶20.] Despite what the circuit court conceded were "impressive credentials and expertise in a variety of areas," Dr. Berkhout was found "not qualified to offer expert testimony in this case." The court relied on *Robertson v. Norton Co.*, 148 F3d 905, 907 (8thCir 1998), a case in which an expert "was undoubtedly qualified to testify about a manufacturing defect in an exploding ceramic grinding wheel," but was deemed not qualified to testify on grinding wheel warnings. The court ruled that the expert's "knowledge of ceramics would not provide the expertise on 'questions of display, syntax, and emphasis' that the jury would expect from a bona fide warnings expert." *Id.* There, the expert's "formal education in warnings consisted of a college entry-level psychology course." *Id.* at 907 n1. And his only

"relevant qualifications were past membership in the Human Factors Society and limited experience looking at literature and drafting warnings for a coal gasification facility." *Id*. As in our case, the expert was also unfamiliar with the ANSI guidelines.

[¶21.]     In contrast, Dr. Berkhout has had considerable experience in the evaluation of instructions and warnings. He published articles on the uses of computer assisted instruction in developing psychomotor skills related to heavy machinery operation; computer assisted instruction in applying psychomotor skill development; and the development of flight control skills in children. He has worked with companies in developing techniques for comparing the effectiveness of various vehicle signal and warning systems and the study and review of highway signage. He has also acted as a consultant in litigation on warnings and instructions on a tire and tire mounting machinery. He has supervised several doctoral dissertations on such subjects as evaluating operating manuals for snowplows and dump trucks, food nutrition labels, and the effect of instruction sets on performance on simulated navy ship operating systems. Apropos to this case, he is presently overseeing and directing a research project on manufacturer instructions for assembling and safely using tree stands for hunting. Under this study, three test groups of subjects are given different assembly instructions and monitored to measure which instructions provide improved assembly time and quality. These qualifications plainly differ with the deficiencies the court found in *Robertson*.

[¶22.]     Another case the circuit court found persuasive was *Pearson v. Young*, an unreported federal district court decision, found at 2002 WL 32026157 (WDOkla).  There, the expert offering opinion testimony on the adequacy of a warning for a forklift was a registered professional engineer, with a Bachelor of Science degree in Mechanical Engineering and a Master of Science in Management. *Id.*  His only exposure to the subject of product warnings was his own attempt to draft a proposed warning for the product in the same litigation he was called to testify in.  *Id.*  Unlike Dr. Berkhout, he had done no testing and had never spoken to the individuals involved in the accident.  *See id.*  Here, Dr. Berkhout reviewed the depositions of Burley and Coach Horacek and then tested the Overspeed Trainer using Kytec's instructions.

[¶23.]     It is true, as the circuit court pointed out, Dr. Berkhout had no experience in drafting or evaluating instructions and warnings for sports equipment.  However, we believe a person with his credentials and experience in the field of product instructions and warnings had the qualifications to render opinions beyond the narrow scope of sports equipment.  Even with the considerable deference the abuse of discretion standard requires, on full consideration of the record, excluding Dr. Berkhout's testimony was an abuse of discretion.  The circuit court set the bar too high.

[¶24.]     "'We interpret our rules of evidence liberally with the "general approach of relaxing the traditional barriers to "opinion" testimony."'" *Guthrie*, 2001 SD 61, ¶36, 627 NW2d at 416 (quoting *Daubert*, 509 US at 588, 113 SCt at

2794, 125 LEd2d 469 (citations omitted)).  *See also* SDCL 19-9-2 (Rule 102).[4]  A party who offers expert testimony is not required to prove to a judge in a *Daubert* hearing that the expert's opinion is correct:  all that must be shown is that expert's testimony rests upon "good grounds, based on what is known."  *Daubert,* 509 US at 590, 113 SCt at 2795, 125 LEd2d 469 (internal quotation marks omitted).  Any other deficiencies in an expert's opinion or qualifications can be tested through the adversary process at trial.  Accordingly, we reverse the circuit court's decision to exclude Dr. Berkhout's opinion testimony based on his qualifications.

[¶25.]　　　The purpose of a *Daubert* hearing is to determine whether the offered "expert testimony both rests on a reliable foundation and is relevant to the task at hand."  *Daubert,* 509 US at 597, 113 SCt at 2799, 125 LEd2d 469.  Although the circuit court ruled that Dr. Berkhout's opinion passed *Daubert's* relevancy prong, and we now set aside its ruling on his qualifications, the court never reached *Daubert's* reliability prong.  *Daubert* sets out a number of nonexclusive factors for determining whether scientific evidence is reliable.  509 US at 592-95, 113 SCt at 2796-98, 125 LEd2d 469.  A court has "'considerable leeway' in deciding in each case 'how to go about determining whether particular expert testimony is reliable.'"

---

4.　　　"Rule 702 reflects an attempt to liberalize the rules governing the admission of expert testimony."  Weisgram v. Marley Co., 169 F3d 514, 523 (8thCir 1999) *aff'd*, 528 US 440, 120 SCt 1011, 145 LEd2d 958 (2000); *see also Daubert*, 509 US at 588, 113 SCt at 2794, 125 LEd2d 469 (citing Beech Aircraft Corp. v. Rainey, 488 US 153, 169, 109 SCt 439, 450, 102 LEd2d 445 (1988)) (highlighting the "'liberal thrust' of the Federal Rules and their 'general approach of relaxing the traditional barriers to 'opinion' testimony'").  The rule clearly "is one of admissibility rather than exclusion."  Arcoren v. United States, 929 F2d 1235, 1239 (8thCir 1991).

Wells v. Howe Heating & Plumbing, Inc., 2004 SD 37, ¶16, 677 NW2d 586, 592 (quoting *Kumho*, 526 US at 152, 119 SCt at 1176, 143 LEd2d 238). "[N]o single factor disposes of a reliability inquiry." *See Daubert*, 509 US at 592-95, 113 SCt at 2796-98, 125 LEd2d 469. *Daubert's* criteria are flexible guidelines that cannot be applied identically over a broad spectrum of disciplines. Indeed, "'the measure of intellectual rigor will vary by the field of expertise and the way of demonstrating expertise will also vary.'" United States v. Conn, 297 F3d 548, 556 (7thCir 2002), *cert. denied*, 538 US 969, 123 SCt 1767, 155 LEd2d 526 (2003) (quoting Tyus v. Urban Search Mgmt., 102 F3d 256, 263 (7thCir 1996), *cert. denied*, 520 US 1251, 117 SCt 2409, 138 LEd2d 175 (1997)). We remand to the circuit court to examine and rule on the reliability question.

### III.

[¶26.]        We next consider whether the circuit court properly granted summary judgment on all of Burley's claims. In reviewing whether summary judgment was properly granted, "we decide only whether there were genuine issues of material fact and whether the law was correctly applied." Toben v. Jeske, 2006 SD 57, ¶9, 718 NW2d 32, 35 (quoting Heib v. Lehrkamp, 2005 SD 98, ¶19, 704 NW2d 875, 882 (citing SDCL 15-6-56(c); Keystone Plaza Condominiums Ass'n v. Eastep, 2004 SD 28, ¶8, 676 NW2d 842, 846)). Burley first alleged that Kytec was negligent because it defectively designed or manufactured the Overspeed Trainer. The court dismissed this claim because Burley failed to present expert testimony to explain "how a reasonable manufacturer could have designed and/or manufactured a safer

alternative."[5]  Burley responds that "Kytec's own testimony conclusively establishes

liability" for her claim.  She relies on Kytec's admission that it never tested the

Overspeed Trainer or any of its component parts before distributing the product.

Burley contends that Kytec also conceded that if the hook were bent, the Overspeed

Trainer would be unsafe.  Therefore, she argues that for this claim no expert

testimony is necessary.

[¶27.]        To establish liability in negligence for defective product design or

manufacture, a plaintiff must show that the defendant failed to use the amount of

care in designing or manufacturing the product that a reasonably careful designer

or manufacturer would use in similar circumstances to avoid exposing others to a

foreseeable risk of harm.  Restatement Second of Torts § 395.  To determine

whether the designer or manufacturer used reasonable care, one must balance what

the designer or manufacturer knew or should have known about the likelihood and

severity of potential harm from the product against the burden of taking safety

measures to reduce or avoid the harm.  *Id.*

[¶28.]        "Whether a manufacturer knew or should have known of a particular

risk involves technical issues which do not easily admit to evidentiary proof and

which lie beyond the comprehension of most jurors."  Peterson v. Safway Steel

Scaffolds Co., 400 NW2d 909, 913 (SD 1987).  In particular, a plaintiff must set

forth sufficient evidence establishing a causal connection between the design defect

and the resulting injury.  Shaffer v. Honeywell, Inc., 249 NW2d 251, 256 (SD 1976),

---

5.    Dr. Berkhout was only offered as an expert on Burley's inadequate
      instructions and failure to warn claims.

*overruled on other grounds,* First Premier Bank v. Kolcraft Enterprises, Inc., 2004 SD 92, 686 NW2d 430. "We do not require that plaintiff eliminate all other possible explanations of causation that the ingenuity of counsel might suggest." *Id.* A plaintiff need only negate misuse of the product. *Id.* However, unless it is patently obvious that the accident would not have happened in the absence of a defect, a plaintiff cannot rely merely on the fact that an accident occurred. *Id.* It is not within the common expertise of a jury to deduce merely from an accident and injury that a product was defectively designed.

[¶29.]     Burley argues that Kytec should have tested the product, and thus, should have known that the hook was bendable. However, Burley has not presented any evidence that even if the hook was bendable that such condition made the product defective. Moreover, it is undisputed that Horacek altered the design of the Overspeed Trainer before Burley's injury. Therefore, even if the bendability of the hook arguably created a defect or dangerous condition in the product, expert testimony is needed to explain to the jury how the design of the Overspeed Trainer, not Horacek's alteration, proximately caused Burley's injuries. *See* Caldwell v. John Morrell & Co., 489 NW2d 353 (SD 1992) (expert testimony is required when the issue falls outside the common experience of a jury).

[¶30.]     Indeed, expert testimony is ordinarily required to establish a claim of negligence in a products liability action. Dancy v. Hyster Co., 127 F3d 649, 654 (8thCir 1997). Applying Arkansas law, the Eighth Circuit Court of Appeals in *Dancy* held that "absent expert testimony, there is no basis for the jury to evaluate the actions of an ordinarily prudent person. . . ." *Id.* (citation omitted); *see* Anderson

v. Raymond Corp., 340 F3d 520, 524-25 (8thCir 2003) (reaching the same decision and upholding summary judgment for claims of negligence, strict liability, and failure to warn due to lack of expert testimony under Arkansas law); Erling v. American Allsafe Co., 230 F3d 1362 (8thCir 2000) (unpublished) (upholding summary judgment on negligent failure to warn, negligent design, and strict liability claims because of lack of expert testimony under North Dakota law).

[¶31.]    A manufacturer's duty to test and inspect traditionally does not give rise to an independent cause of action for products liability.[6]  Rather, the plaintiff must prove, among other things, that because of the manufacturer's failure to test and inspect, the accident occurred.  Here, it is outside the common experience and capability of a jury to determine (1) that the possibility a user could bend the hook made the Overspeed Trainer defective, (2) if Kytec would have tested or inspected the Overspeed Trainer, it would have learned that the hook was bendable, and (3)

---

6.    Burton v. R.J. Reynolds Tobacco Co., 397 F3d 906, 920 (10thCir 2005) ("plaintiff must prove that the manufacturer's failure to test its product resulted in a defective product that caused injury to the plaintiff") (citing Lindquist v. Ayerst Laboratories, Inc., 607 P2d 1339, 1350 (Kan 1980)); Kociemba v. GD Searle & Co.,707 FSupp 1517, 1527 (DMinn 1989) ("unless the manufacturer's breach of its duty to test leads the manufacturer to produce a product that is defective in design, manufacture, or warning, no injury can result"); Valentine v. Baxter Healthcare Corp., 81 CalRptr2d 252, 265 (CalCtApp 1999); West v. Broderick & Bascom Rope Co., 197 NW2d 202, 212 (IA 1972) ("[f]or testing to be material, substantial evidence must be introduced of a defect in the article"); Vassallo v. Baxter Healthcare Corp., 696 NE2d 909, 921 (Mass 1998) (breach of duty to test does not create an independent cause of action); Green v. General Motors Corp., 709 A2d 205, 216 (NJCtApp 1998) ("a failure to test or of inadequate testing may be evidential as an explanation of why a design was defective, but it is not in itself proof of a separate basis for liability"); *see also* Oddi v. Ford Motor Co., 234 F3d 136, 143 (3dCir 2000) (no independent cause of action in Pennsylvania for negligent failure to test).

whether the alteration of the product by Horacek or Kytec's failure to test and inspect was a proximate or legal cause of Burley's injuries. Thus, with respect to Burley's negligent defective design and manufacture claim, expert testimony was required, and therefore, the circuit court properly granted summary judgment.

[¶32.]     In her next claim, Burley alleges that Kytec is responsible under a theory of strict liability (defective design). Strict liability arises when a manufacturer "sells any product in a defective condition unreasonably dangerous to the user or consumer. . . ." *Peterson*, 400 NW2d at 912 (citations omitted). "It is the unreasonableness of the condition of the product, not of the conduct of the defendant, that creates liability." *Id.* (citing Jackson v. Coast Paint & Lacquer Co., 499 F2d 809 (9thCir 1974)). Unlike in a negligence claim, a defendant cannot avoid liability simply because at the time of production it did not know or could not have known of the product's dangerous proclivities. *See id.* However, to establish a claim for strict liability (defective design), Burley must prove that the Overspeed Trainer "was in a dangerous and defective condition when it left the manufacturer." *See* Engberg v. Ford Motor Co., 87 SD 196, 205, 205 NW2d 104, 109 (1973). Further, under SDCL 20-9-10, "[n]o manufacturer . . . of a product may be held liable for damages for personal injury, . . . sustained by reason of the doctrine of strict liability in tort based on a defect in a product . . . where a proximate cause of the injury . . . was an alteration or modification of such product[.]" Therefore, Burley also has the burden of establishing an evidentiary basis for the proximate or legal cause element of her claim.

[¶33.]    As with her negligence claim, Burley contends that because Kytec knew that the Overspeed Trainer would be unsafe if the hook were bent, it should have designed a product "with a hook that would withstand attempts to bend it." According to Burley, expert testimony is not necessary to explain to a jury that a stronger hook could have been used, thereby making the product safer. However, expert testimony is required to identify for the jury how the purportedly defective hook was the proximate or legal cause of Burley's injuries. On this, she has not offered any evidence. She relies solely on her argument that a stronger hook could have been made, and because it was not, the Overspeed Trainer was defective and because she was injured the defect caused her injury.

[¶34.]    A central element to her strict liability (defective design or manufacture) claim is that the defect was the cause of her injuries. While legal or proximate cause is generally a jury question, a causal relationship between the alleged defect and injury is not presumed. To survive a motion for summary judgment, Burley "must present more than '[u]nsupported conclusions and speculative statements, [which] do not raise a genuine issue of fact.'" *See* Bordeaux v. Shannon County Schools, 2005 SD 117, ¶14, 707 NW2d 123, 127 (quoting Paradigm Hotel Mortg. Fund v. Sioux Falls Hotel Co., Inc., 511 NW2d 567, 569 (SD 1994)) (additional citation omitted). She has not provided an evidentiary basis tending to show that the injury was caused by a defect rather than the alteration of the product. Therefore, the circuit court properly granted summary judgment on this claim.

[¶35.] Lastly, Burley asserts that Kytec is liable for its failure to warn of the dangerous condition of the Overspeed Trainer. To prevail on a claim for strict liability (failure to warn), Burley must establish that

1. a danger existed associated with a foreseeable use of the product;
2. an inadequate warning was given regarding the danger;
3. as a result of the inadequate warning, the product was rendered defective and unreasonably dangerous;
4. the defective and unreasonably dangerous condition existed at the time it left the control of the manufacturer;
5. the product was expected and did reach the user without a substantial unforeseeable change in the condition that it was in when it left the manufacturer's control; and
6. the defective condition was the legal cause of [her] injuries.

South Dakota Pattern Jury Instruction 150-04. "The issue under strict liability is whether the manufacturer's failure to adequately warn rendered the product unreasonably dangerous without regard to the reasonableness of the failure to warn judged by negligence standards." *Peterson*, 400 NW2d at 912 (citation omitted). "Further, the product itself need not be defective. Where a manufacturer or seller has reason to anticipate that danger may result from a particular use of [the] product, and [the manufacturer] fails to give adequate warning of such a danger, the product sold without such warning is in a defective condition within the strict liability doctrine." *Jahnig*, 283 NW2d at 560 (citations omitted); *see also* Prince v. Parachutes, Inc., 685 P2d 83, 87 (Alaska 1994) (citations omitted).

[¶36.] Although it is not clear from plaintiff's appellate briefs whether *negligent* failure to warn remains in issue here or whether Dr. Berkhout's opinions were offered in support of such claim, his qualifications, subject to a reliability finding, may be sufficient to support that claim. To establish liability for negligent

failure to warn, a claimant must prove that (1) the manufacturer knew or reasonably should have known that the product was dangerous or was likely to be dangerous when used in a reasonably foreseeable manner; (2) the manufacturer knew or reasonably should have known that users would not realize the danger; (3) that the manufacturer failed to exercise reasonable care and adequately warn of the danger or instruct on the safe use of the product; (4) that a reasonable manufacturer under the same or similar circumstances would have warned of the danger or instructed on the safe use of the product; (5) that the claimant was harmed; and (6) that the manufacturer's failure to warn or instruct was a proximate or legal cause of the claimant's injury. Restatement Second of Torts § 388. *See also* Jahnig v. Coisman, 283 NW2d 557, 560 (SD 1979) (citations omitted).

[¶37.]      Causation is an essential element in a failure to warn claim. Therefore, to survive a motion for summary judgment, Burley must present sufficient evidence to show that the bending of the hook was a foreseeable alteration that made the product unreasonably dangerous. She must also establish that Kytec should have included a warning against this foreseeable alteration, and even though the hook was bent, the failure to warn legally caused her injuries.[7] As with her prior claims, Burley directs this Court to testimony from Kytec that it did not test or inspect the Overspeed Trainer before putting it into the stream of commerce

---

7.    In its brief to this Court, Kytec contends that because Burley did not read the instructions, the proper party to bring a failure to warn claim would be Horacek. Horacek, however, was in a role as *parens patriae* when reading the instructions before the student athletes' use of the Overspeed Trainer. Therefore, that fact that Burley did not read the instructions is immaterial.

and that Kytec acknowledged there were no warnings of any kind on the Overspeed Trainer or in the instructions accompanying it. Thus, because Kytec knew that the Overspeed Trainer would be unsafe if the hook was bent, Burley insists that this admission alone creates a material issue of fact on her claim for strict liability (failure to warn).

[¶38.]     Although Kytec acknowledged that a bent hook would make the Overspeed Trainer unsafe, and conceded that it did not test or inspect the product to determine whether an adequate warning should have been provided against bending the hook, the fact that an accident occurred while Burley was using the Overspeed Trainer does not perforce mean that Kytec's failure to warn was the legal cause of Burley's injuries. Indeed, a manufacturer has a duty to test and inspect its products and a breach of this duty can render a product defective. However, a failure to test or inspect cannot, standing alone, cause the resulting injury. *See supra* n6. Rather, the duty to warn "may well *encompass* a duty to test a product to discover defects." *Kociemba*, 707 FSupp at 1527 (quoting Willmar Poultry Co. v. Carus Chemical Co., 378 NW2d 830, 836 (MinnCtApp 1985)).

[¶39.]     Therefore, Burley must establish a causal relationship between Kytec's failure to warn and her injury. This requires testimony about the product's design and how, even though Horacek bent the hook, the lack of warnings included with or on the Overspeed Trainer was the legal cause of her injuries. As with her previous claims, causation for failure to warn requires expert testimony. It is beyond the common expertise of a jury to determine that (1) the Overspeed Trainer was defective or unreasonably dangerous based on Kytec's failure to test or inspect it, (2)

Horacek's bending of the hook was a foreseeable change in the product that Kytec had a duty to warn against, and (3) even though the hook was bent, Kytec's failure to warn was the legal cause of Burley's injuries.

[¶40.] Had the product not been altered before the accident, Burley may have had sufficient evidence without expert testimony because absent a misuse or alteration it may be reasonable to infer the Overspeed Trainer was the legal or proximate cause of her injuries. However, to impose liability for Kytec's failure to test and inspect the Overspeed Trainer, "where the causal link to the known harm to [Burley] is the *unknown outcome of testing that was not done,* would be beyond the pale of any . . . tort doctrine we can identify." *See Valentine*, 81 CalRptr2d at 265; *see also Kociemba*, 707 FSupp at 1527.

[¶41.] Dr. Berkhout is qualified to render opinions on the failure to warn claims. Accordingly, with respect to those claims (strict liability and negligence), if the circuit court finds that any of Dr. Berkhout's opinions meet the reliability prong from *Daubert*, then those opinions will be sufficient for these claims to be presented to the jury. On the other hand, should the court find the opinions unreliable, these claims cannot proceed without expert opinion testimony.

[¶42.] Affirmed in part, reversed in part, and remanded.

[¶43.] GILBERTSON, Chief Justice and ZINTER, Justice, concur.

[¶44.] SABERS and MEIERHENRY, Justices, concur in part and dissent in part.

#24132

SABERS, Justice (concurring in part & dissenting in part).

[¶45.]        If the trial court had its way, manufacturers of specially designed products could plagiarize or copy another manufacturer's product without using, testing, designing, instructing on proper use, or warning on improper use.  The product could be unworkable, defective, dangerous and could be marketed to South Dakota consumers almost without risk or liability.  Thank God the majority opinion puts a stop to that scenario, at least in part.

[¶46.]        However, the trial court made many other errors, which the majority opinion failed to correct.  These errors result from an excessive view of the need for expert testimony and the qualifications therefore, a rush to summary judgment when genuine issues of material fact exist, and excessive emphasis on admissibility over the weight of opinion evidence.

[¶47.]        As indicated in the majority opinion at paragraph 24, all that must be shown is that expert's testimony rest upon "good grounds, based on what is known." *See Daubert*, 509 US at 590, 113 SCt at 2795 (internal quotations omitted).  The rule (Rule 702) clearly "is one of admissibility rather than exclusion." *See supra* ¶24 n4 (quoting *Arcoren*, 929 F2d at 1239).  The majority opinion corrects the trial court's error on this part.

[¶48.]        However, the majority opinion fails to correct the remainder of the mistakes.  Facts supporting reversal of summary judgment on 1) negligence and 2) strict liability (defective design) appear in the majority opinion at ¶4 as follows:

> After Horacek assembled it, he attempted to use it to see
> if it would release as the instructions indicated.  He
> noticed that the hook on the sprinter's belt would rotate
> downward, thereby "making it virtually impossible for a

> 'downward chop' to release the hook and ring." Because the downward chop was a means of releasing the sprinter from the pacer's pull, Horacek decided to bend the hook just enough to make it easier for the ring to release. He bent the hook by using pliers and then tried using the device again. This time, he believed that the hook and ring released appropriately when he applied the downward chop.

*Supra* ¶4.

[¶49.] Because the hook would rotate downward, it was virtually impossible for a downward chop to release the hook and ring. Obviously, it was foreseeable that someone would bend this hook to allow the ring to release, especially in view of the absence of instructions to the contrary and the fact that the downward chop was a purported safety release. In addition, if the hook should not have been bent, it could have been so designed or made with sturdier materials to prevent bending. The majority opinion claims Burley has "not provided an evidentiary basis tending to show that the injury was caused by a defect rather than the alteration of the product." *Supra* ¶34. However, the fact that the ring could be bent, coupled with the admissions Kytec knew the product would be dangerous if the ring was bent, and did no testing to discover if the ring could be bent, is ample evidence for the jury. "The law recognizes that there can be strict liability of a supplier even though the product is altered or changed if it is foreseeable that the alteration would be made and the change does not unforeseeably render the product unsafe." Zacher v. Budd Co., 396 NW2d 122, 135 (SD 1986).

[¶50.] Moreover, the Eighth Circuit has held, and this Court has noted in one of our cases, that "where there exists both a design defect and misuse of the product, and it is assumed that each contributes to an accident, the misuse of the

product is not an intervening cause if the misuse was foreseeable." *Id.* (quoting Griggs v. Firestone Tire & Rubber Co., 513 F2d 851, 861-62 (8thCir) *cert. denied*, 423 US 865, 96 SCt 124, 46 LEd2d 93 (1975)). Therefore, Kytec cannot escape liability because of the alteration. Kytec admitted the product would be dangerous if the hook was bent, yet did no testing to ensure the hook could not be bent or even warn consumers not to bend the hook. The coach bent the hook so the product would release as the instructions purported it would. Burley suffered a great injury. Kytec should not escape liability because the trial court and the majority opinion believe the jury needs expert testimony to spoon feed it something that can be deduced by the jury itself under the facts presented.

[¶51.]     These questions present genuine issues of material fact concerning negligence, strict liability (defective design). The trial court is supposed to maintain an even playing field, not one slanted uphill. The trial court is supposed to be the *gate* keeper, not the *goal* keeper, nor the *score* keeper. We should reverse and remand for a fair trial on all issues.

[¶52.]     It was clear error for the trial court and the majority opinion to affirm the summary judgment on negligence, strict liability (defective design) when the admission of Dr. Berkhout's expert opinion testimony, the admissions by Kytec and the common sense and knowledge of the jury may be more than enough to support all three causes of action. The majority opinion claims imposing liability "for Kytec's failure to test and inspect the Overspeed Training, where the causal link to the harm to [Burley] is the unknown outcome of testing not done, would be beyond the pale of any . . . tort doctrine we can identify." *Supra* ¶40 (quoting *Valentine*, 81

CalRptr2d at 265). However, using summary judgment to dispose of claims that have ample evidence and questions for the jury goes beyond our repeatedly admonished narrow use of summary judgment. *See* Heib v. Lehrkamp, 2005 SD 98, ¶45, 704 NW2d 875, 889-90 (Sabers, J., dissenting) (noting summary judgment is an extreme remedy only to be used "when the truth is clear"); Richards v. Lenz, 539 NW2d 80, 83 (SD 1995) (noting that "[s]ummary judgment is a drastic remedy and should not be granted unless the moving party has established a right to a judgment with such clarity as to leave no room for controversy").

[¶53.]     This case is one to be decided by a jury. "It is inappropriate to affirm a trial court's grant of summary judgment merely because we might believe the non-moving party would not have prevailed at trial." *Heib*, 2005 SD 98, ¶46, 704 NW2d at 891 (Sabers, J., dissenting) (citing Wulf v. Senst, 2003 SD 105, ¶17, 669 NW2d 135, 141). Summary judgment is not to be used to control cases whose outcomes are in doubt.

[¶54.]     Because material issues of genuine fact exist and expert testimony is not necessarily needed to support Burley's claims, I dissent.

MEIERHENRY, Justice (concurring in part and dissenting in part).

[¶55.]     I concur on Issue 1 (Daubert) and join Justice Sabers' dissent on the other issues.